# No. 23-7593

### In the United States Court of Appeals for the Second Circuit

SHENZHEN LANTENG CYBER TECHNOLOGY CO., LTD.,

*Petitioner-Appellant,*

v.

AMAZON.COM SERVICES, LLC, A DELAWARE LIMITED LIABILITY COMPANY, AMAZON.COM, INC., A DELAWARE CORPORATION,

*Respondents-Appellees.*

_____

On Appeal from the United States District Court
for the Southern District of New York
No. 1:23-cv-00991-GHW

## APPELLANT'S BRIEF AND SPECIAL APPENDIX

Julie Guo
Counsel for Appellants
200 E 36th Street, Suite 16A
New York, NY 10016
Jslawusa@gmail.com
Telephone: (917) 773-1868

*Attorney for Petitioner - Appellant*
SHENZHEN LANTENG CYBER TECHNOLOGY CO., LTD.

## Corporate Disclosure Statement

Pursuant to Fed. R. App. P. 26.1, **Petitioner - Appellant,**
**SHENZHEN LANTENG CYBER TECHNOLOGY CO., LTD.** makes
the following disclosures:

1. For non-governmental corporate parties please list all parent
corporations:

N/A

2. For non-governmental corporate parties please list all publicly
held companies that hold 10% or more of the party's stock:

N/A

3. If there is a publicly held corporation which is not a party to the
proceeding before this Court but which has as a financial interest in the
outcome of the proceeding, please identify all such parties and specify
the nature of the financial interest or interests:

N/A

Dated: February 15, 2024          By: /s/ Julie Guo _____

# **TABLE OF CONTENTS**

Page

CORPORATE DISCLOSURE STATEMENT ..............................................i

TABLE OF CONTENTS ..................................................................ii

TABLE OF AUTHORITIES ..............................................................iv

APPELLANT'S BRIEF ..................................................................... 1

JURISDICTIONAL STATEMENT ................................................... 1

QUESTIONS PRESENTED FOR REVIEW ....................................... 2

PRELIMINARY STATEMENT ...................................................... 2

I. Amazon's History of Coercive Tactics ............................. 4

II. Amazon's Exploitation of Small Sellers ......................... 6

III. Amazon's Absolute Power Over Every Seller's Business............. 9

IV. The Impact That This Court' Rulings Will Have On
Millions of Third-Party Seller's Life And The Whole E-
Commerce Industry.............................................................. 10

STATEMENT OF THE CASE ........................................................ 15

I. Facts Specific to this Action............................................ 15

II. Procedural History ........................................................ 17

STANDARD OF REVIEW .............................................................. 18

ARGUMENT ................................................................................. 19

Part 1 Manifest Disregard of Law .................................................. 19

I. Section 2 of the BSA is an unenforceable penalty clause
under Washington law. ........................................................ 20

II. The Arbitrator Did Manifestly Disregard the Law ................... 27

Part 2 Violation of Public Policy ..................................................... 29

a. Enforcement of the arbitration award violates
public policy under Washington Law's 6-Factor
Balancing Test. ................................................................. 31

CONCLUSION ............................................................................. 38

CERTIFICATE OF COMPLIANCE ................................................. 39

CERTIFICATE OF SERVICE ................................................................. 40

SPECIAL APPENDIX ........................................................................ 41

# TABLE OF AUTHORITIES

Page

**Cases:**

*Banco de Seguros del Estado v. Mut. Marine Office, Inc.*
344 F.3d 255 (2d Cir. 2003) ............................................... 20

*Cabrini Med. Ctr. v. Local 1199, Drug, Hosp. & Health Care
Empls. Union, RWSDU*
731 F.Supp. 612 (S.D.N.Y. 1990) ..................................... 29

*Cowin Tech. Co., Ltd. v. Amazon.com Servs., LLC et al.*
No.1:23-cv-03054-ALC
(S.D.N.Y. 2023) ............................................................... 14

*Dongguan Likaixiao Tech. Co., Ltd. v. Amazon, et al.*
No. 01-21-0018-1838
(ICDR Case Jan. 30, 2023) ............................................. 26

*Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*
156 F.3d 310 (2d Cir. 1998) ............................................. 30

*Forest Mktg. Enters., Inc. v. State, Dep't of Natural Res.*
125 Wash.App. 126 (2005) ............................................... 21

*In Re Late Fee & Over-Limit Fee Litig.*
741 F.3d 1022 (9th Cir 2014) .................................... 21, 22

*In re Potential Dynamix LLC*
No. 2:11-BK-28944-DPC
2022 WL 18635242 (Bankr. D. Ariz. July 18, 2022) ........... 31, 32, 33

*Mobile Galaxy, LLC v. Amazon.com, LLC*
No. 01 19-0002-2648
(Jan. 6, 2021) .................................................................. 10

*Nat'l Football League Mgmt. Council v. Nat'l Football League
Players Ass'n*
820 F.3d 527 (2d Cir. 2016) ............................................. 18

*Riley v. Iron Gate Self Storage*
198 Wash.App. 692 (2017) ............................................... 31

*Scandinavian Reinsurance Co. v. Saint Parul Fire & Marine Ins. Co.*
  668 F.3d 60 (2d Cir. 2012) .......................................................... 1, 19

*Shenzhen Lanteng Cyber Tech. Co., Ltd. v. Amazon.com Servs., LLC, et al.*
  No. 01–22–0000–2374
  (ICDR Case) ............................................................................... 18

*Shields v. Sta-Fit, Inc.*
  79 Wash.App. 584 (1995) ......................................................... 32

*United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*
  484 U.S. 29 (1987) ................................................................... 30

*W.R. Grace & Co. v. Loc. Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*
  461 U.S. 757 (1983) ................................................................. 30

*Wallace v. Buttar*
  378 F.3d 182 (2d Cir. 2004) ......................................... 20, 28, 29

*Walter Implement, Inc. v. Focht*
  107 Wash.2d 553 (1987) ..................................... 21, 22, 28

*Watson v. Ingram*
  124 Wash.2d 845 (1994) ........................................... 21, 28

*Westerbeke Corp. v. Daihatsu Motor Co. Ltd.*
  304 F.3d 200 (2d Cir. 2002) ................................................ 19

*Zuver v. Airtouch Commc'ns, Inc.*
  153 Wash.2d 293 (2004) ......................................................... 32

**Statutes:**

9 U.S.C. § 202 ........................................................................... 1

9 U.S.C. § 203 ........................................................................... 1

9 U.S.C. § 207 ........................................................................... 1

28 U.S.C. § 1291 ....................................................................... 1

**Other:**

Brian Fung, "*US government and 17 states sue Amazon in landmark monopoly case*" (Sept. 28, 2023) ................................ 5, 8

Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 ................................................................................. 19

Federal Trade Commission, "FTC Sues Amazon for Illegally Maintaining Monopoly Power" (Sept. 26, 2023) ........................... 5

"*Investigation of Competition in Digital Markets,*" Majority Staff Report and Recommendations, House Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary (Oct. 6, 2020) ..................... 5, 6, 7, 8, 34

Isobel Asher Hamilton, "Amazon shut down its program that paid warehouse 'ambassadors' to tweet positively about the company, report says." Business Insider (Jan. 26, 2022) .............. 13

J.M. Perillo, Calamari, and Perillo on Contracts § 14–32 (6th ed. 2009) ......................................................................... 26

Katherine Anne Long, "Amazon abruptly banned Washington state treat-maker Chukar Cherries. Months of appeals went unheeded," The Seattle Times (Sept. 27, 2021) ........................ 36, 37

Marcia Savage, *Amazon's e-commerce dominance: Is the price too high?* The Future of Commerce (Jan. 28, 2022) ........................ 6

Marcia Savage, "*Amazon's e-commerce dominance: Is the price too high?*", THE FUTURE OF COMMERCE (Jan. 28, 2022) ......... 34

Restatement of Contracts § 339 (1932) .............................................. 21

Wall Street Journal, "SEC Is Investigating How Amazon Disclosed Business Practices" (April 6, 2022) ................................... 8

## Appellant's Brief

## JURISDICTIONAL STATEMENT

The Court has federal-question jurisdiction 9 U.S.C. § 203, which provides: "The district courts of the United States … shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy," as the arbitration rests on a dispute that is not "entirely between citizens of the United States." § 202–03; see also § 207 ("[A]ny party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration").

The District Court had subject matter jurisdiction over this action pursuant to 9 U.S.C. § 203, insofar as the Appellant's Petition to vacate the arbitral award is governed by the New York Convention of 1958 because the Appellant is a Chinese Corporation. *Scandinavian Reinsurance Co. v. Saint Parul Fire & Marine Ins. Co.*, 668 F.3d 60 (2d Cir. 2012). This Court has jurisdiction over the appeal of this matter pursuant to 28 U.S.C. § 1291, following the District Court's final denial of the petition.

## QUESTIONS PRESENTED FOR REVIEW

1. Did the District Court err in holding that the Arbitrator did not manifestly disregard the law even though the Arbitrator did not have any justification for his decision?

The answer to this question is YES.

2. Did the District Court err in rejecting Petitioner's argument that enforcement of the arbitration award violates public policy?

The answer to this question is YES.

## PRELIMINARY STATEMENT

*"Power tends to corrupt, and absolute power corrupts absolutely."*

*Lord John Acton, 1887*

The Petitioner ("Third-Party Seller" or "Seller") is a small retail company that wanted to sell its products on the e-commerce marketplace controlled by Amazon.com Services LLC, and its related companies ("Amazon" or "Respondent"). In order to conduct business through Amazon, it was required to adhere to Amazon's standard form, the Amazon Services Business Solutions Agreement (the "BSA" or "Agreement"). Having no experience in the U.S. market, Claimant did not know that the BSA was an adhesion contract and several of its

2

terms were unconscionable and unenforceable. Once Claimant became an authorized Seller, all its communications with Amazon, including all business interactions, all emails, all sales transaction records, and all financial records, were made through Amazon's proprietary computer portal called Seller Central. Communicating by voice with an authorized person was essentially impossible.

Having started selling on Amazon in 2018, Petitioner soon built a vibrant and profitable retail business, Amazon had made substantial amount of sales commissions and other fees from the Petition for over three years. In 2021, Amazon abruptly deactivated the Petitioner's accounts and seized the Petitioner's entire sales proceeds in the seller account with no prior warning by sending an auto message notice, accused Petitioner of "review abuse" but failed to provide any evidence of these baseless allegations in its Account Deactivation Notice (Record On Appeal, APP 74). To desperately get its seller account reinstated to survive, the Petitioner sent Amazon an Plan of Action, admitting review abuse and offering a plan of action to correct the alleged violations.

However, Amazon refused not only to reinstate the seller account, but also refused to disburse the Petitioner's sales proceeds in the seller account, which represent customer payment for the Petitioner sold merchandise and Amazon already deducted its sales commissions and other fees from these sales proceeds.

3

Amazon claims it seized the Claimant's sales proceeds as liquidated damages per Section 2 of the BSA. However, Section 2 allows Amazon to seize "any payment" in the seller account, and there is no proof that these alleged "liquidated damages" have any relationship to any damage Amazon may have allegedly suffered. Over fifteen arbitrators ruled Section 2 is an invalid liquidated damage clause and unenforceable penalty clause because the "any payment" in the Section 2 cannot pass the reasonable forecast standard under Washington law to be valid liquidated damage clause.

Even more outrageous, later on, Amazon simply converted the remaining balance of the Claimant's proceeds in the seller account and unjustly enriched itself. A recent check of the Petitioner's seller account indicated that it has a nearly "zero balance" in its seller account on Amazon.com.

## I. Amazon's History of Coercive Tactics

The claims asserted by Petitioner against Amazon are typical of how small third-party sellers ("Sellers") have been routinely exploited and abused by Amazon for many years. This pattern of appalling business practices and behavior finally attracted government action. On September 26, 2023, the U.S. government and 17 states sued Amazon in a landmark monopoly case reflecting years of allegations that Amazon abused its economic dominance and harmed fair competition. The

172-page complaint alleges Amazon unfairly promotes its own platform and services at the expense of Sellers who rely on the company's e-commerce marketplace for distribution.[1] In its press release, the Federal Trade Commission ("FTC") Chair Lina Khan accused Amazon of using "*punitive and coercive tactics*" to preserve its illegal monopoly. "Amazon is now exploiting its monopoly power to enrich itself while raising prices and degrading service for the tens of millions of American families who shop on its platform and the hundreds of thousands of businesses that rely on Amazon to reach them," Khan said, "Today's lawsuit seeks to hold Amazon to account for these monopolistic practices and restore the lost promise of free and fair competition."[2]

Amazon's singular dominance and market power have been recognized by Congress. According to the *Majority Staff Report and Recommendations, House Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary,* of which the Claimant requests the Arbitrator to take judicial notice, Amazon is the dominant online marketplace. It reportedly controls about 65% to 70%

---

[1]   Brian Fung, "*US government and 17 states sue Amazon in landmark monopoly case*" (September 28, 2023), available at https://www.cnn.com/2023/09/26/tech/ftc-sues-amazon-antitrust-monopoly-case/index.html

[2]   Federal Trade Commission, "FTC Sues Amazon for Illegally Maintaining Monopoly Power" (Sep 26, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/09/ftc-sues-amazon-illegally-maintaining-monopoly-power

of all U.S. online marketplace sales[3] Amazon is the most-visited website
in the world for e-commerce and shopping.[4] Amazon has monopoly
power over most Sellers and many of its suppliers.[5] Retailers have no
alternative but to submit to Amazon's business terms because that is
where the buyers are.[6] Small retailers have no viable or meaningful
choice other than accepting Amazon's BSA terms and its control of their
inventory, shipping, and finances if they want to get their products seen
by most online consumers.[7]

## II. Amazon's Exploitation of Small Sellers

Sales on Amazon fall into one of two categories: (1) first-party sales,
which refer to the sales of Amazon's own private-label products or
wholesale products sourced by Amazon, and (2) third-party sales, which
refer to sales by independent merchants who sell their own products
through the Amazon Platform. Since Amazon reaps *thirty-five percent*
(35%) of the sales proceeds of the average Seller, one might wonder why

---

[3]   See Page 225 of Majority Staff Report and Recommendations, House
Subcommittee on Antitrust, Commercial and Administrative Law of the
Committee on the Judiciary ("House Report")

[4]   *Id.* page 256

[5]   *Id,* page 256

[6]   *Id,* page 256

[7]   Marcia Savage, *Amazon's e-commerce dominance: Is the price too
high?* The Future of Commerce (January 28, 2022), available at
https://www.the-future-of-commerce.com/2022/01/28/amazons-e-
commerce-dominance-is-the-price-too-high.

Amazon continually fails to treat Sellers fairly. The reason is that exploits the Sellers while constantly gaining more customers for its own sales. Therefore, there is significant competition between first-party sales (Amazon's direct sales) and third-party sales, including Claimant. In its internal documents, Amazon refers to Sellers as "*internal competitors.*"[8]

Besides providing online retail platform services, Amazon provides Sellers with Fulfillment by Amazon program services. Sellers who use FBA services ship their product inventory to Amazon's warehouses or "fulfillment centers." After a customer places an order online, Amazon fulfills the order by picking, packing, and shipping those products. Given that FBA is effectively the only way for Sellers to get a Prime badge on their listings, Amazon's algorithm favors Sellers who use FBA over those who do not for both its search rankings and the Buy Box.[9] Most Sellers rely on FBA services to maintain a favorable search position afforded them by Amazon's algorithm.[10] Effectively, Amazon has complete control over the Sellers' accounts, sales proceeds in the

---

[8]   See Page 268 of House Report, *Id*

[9]   *Id,* page 288

[10]   House Report at 288, n.1780-81

account, and inventory in Amazon's warehouse. The combination of exploitive fees and complete control, turn Sellers into the twenty-first century's equivalent of sharecroppers.[11]

The FTC's pending litigation and the facts uncovered by the House Subcommittee in its report are materially relevant to this case because a crucial issue for the Arbitrator to decide in this case is *whether Sections 2, 3 and 8 of the BSA are unconscionable.* This requires a determination of whether the Claimant had any viable or meaningful choice but to enter into the BSA to succeed in its online business. As the FTC alleges, due to Amazon's dominance in e-commerce, Sellers have little option but to accept Amazon's exploitive terms, resulting in higher prices for consumers and a worse consumer experience.[12]

For years, Amazon's critics, including US lawmakers, European regulators, Sellers, consumer advocacy groups, and more, have accused the company of using its market power to force its Sellers to accept anticompetitive term[13]. Sellers also have accused Amazon of arbitrarily blocking their Seller accounts and withholding sales proceeds, spying on

---

[11]   *See* House Report at 271.

[12]   Brian Fung, "US government and 17 states sue Amazon in landmark monopoly case" (September 28, 2023), available at https://www.cnn.com/2023/09/26/tech/ftc-sues-amazon-antitrust-monopoly-case/index.html

[13]   Wall Street Journal, "SEC Is Investigating How Amazon Disclosed Business Practices" (April 6, 2022) https://www.wsj.com/articles/sec-is-investigating-how-amazon-disclosed-business-practices-11649271819

them, copying their best-selling products, and giving Amazon's own products—first-party sales—preferential search results. All these activities reflect Amazon's absolute power over the Sellers.

### III.  Amazon's Absolute Power Over Every Seller's Business

As previously noted, before an independent merchant can open a third-party seller account ("Account") on the Amazon Platform, they must adhere to the BSA. These small domestic and foreign merchants have no negotiation power as to the fairness of the BSA's terms.

Once a Seller establishes an account and gains sales, its entire business remains in jeopardy due to Amazon's absolute control of its fate. Through abrupt account deactivations under Section 3 of the BSA (Exhibit APP 32), Amazon removes the selling privileges of Sellers *at will*, thus reducing the competition between Sellers and Amazon's own sales.

Upon account deactivation, Amazon also confiscates *the entire sales proceeds* in the Seller's account, ranging from thousands to millions of dollars. Many small companies do not have the resources to contest their termination. Through this scheme of confiscating the proceeds found in Sellers' accounts, Amazon adds to its profits.

Amazon justifies this unwarranted money grab by relying on Section 2 of the BSA. Section 2 provides in part: "If we determine that your account—or any other account you have operated—has been used to

9

engage in deceptive, fraudulent, or illegal activity (including the sale of counterfeit goods), or to repeatedly violate our Program Policies, then *we may in our sole discretion permanently withhold any payments to you."* By this contract term, Amazon appoints itself prosecutor, judge, jury, and executioner of the fate of small Sellers like Claimant.

Section 2 is not labeled in the BSA as a liquidated damages clause. However, since no private party may simply award itself contract damages, this provision has only one purpose: to recover alleged damages alleged by Amazon as a result of a Seller's activity by Amazon's sole determination.[14] At least fifteen arbitrators have already ruled that Section 2 is unenforceable.

There is no colorable justification for anyone to argue that Amazon can bully Sellers like the Petitioner and confiscate the all hard-earned sales proceed lawfully under BSA Section 2.

## IV. The Impact That This Court' Rulings Will Have On Millions of Third-Party Seller's Life And The Whole E-Commerce Industry.

The Appeal is made on the basis of a serious legal question that has emerged from the rapid, unique, and sweeping force of e-commerce and international trade, but centering on whether a seller's interests in its

---

[14] "Interim Arbitration Award" in *Mobile Galaxy, LLC v. Amazon.com, LLC* (AAA Commercial Arbitration No. 01 19-0002-2648) dated January 6, 2021 (Exhibit CA7)

seller account on Amazon.com are funded by consideration to the seller from customers. Amazon maintained this holding account for escrow-like purposes, including fulfilling and settling transactions of the seller's products sold through Amazon's global online marketplace. Amazon both regulates its proprietary marketplace, which undoubtedly is one of the most dominant market forces in history.

The key legal questions behind this issue turn on a set of very basic and fundamental principles of contract law, which are wide-spreadly accepted as "black letter law," drawn from the State of Washington, Amazon's choice of law in the Mandatory Arbitration Clause-Section 18 of Amazon's BSA. But because of the special nature of this matter by involving Amazon, these issues are apposite to the laws and principles in law for addressing the structural conflicts of interest when a single party owns, runs, regulates, and draws revenue from a dominating marketplace of its own pioneering design that in many ways could also be likened to a public good. Our central concern is that Amazon is punishing third-party sellers on its marketplace beyond what can be read as justifiable and reasonable under the contract in question, which exists as a collective online body of terms of service for the marketplace in general and for the key services that it provides.

Specifically, the operative facts involve whether Respondent may deem all of the funds in the seller account, comprised of consideration that customers paid for goods that Respondent held refusing to disburse

11

to the Petitioner, and being "forfeited" without any process or color of law and as an automatic consequence of closing down an account. Essentially, forfeiture constitutes an example of "spoils to the victor," or the metaphor in business strategy of taking out market prey, in the manner of a public execution without due process, against small third-party sellers whose basic property interests are protected under the US constitution laws and other applicable laws.

In this business relationship between Amazon and third-party seller, Amazon makes the rules, may interpret them through the lens of its business interests (especially under the context that Amazon's own sales are competing with third-party sales), develops AI-enhanced algorithms meant to flag such issues then deactivate the seller account and seize their sales proceeds without due process before the account deactivation and fund seizing, internally adjudicates whether the seller committed the breach, decides how much it would seize the seller's entire sales proceeds in the seller account, which is under its sole custody, and decides whether to conduct a forfeiture of the seller's sales proceeds in its "sole discretion."

Checks and balances are fundamental to the integrity of law. A single legal determination here threatens to unravel that principle. Nearly 250 years later, the same basic principle applies. Respondent

appropriated substantial funds from Petitioner's seller account, doing so without any sound or simple justification from even formulaically estimating actual losses resulting from the stated breach.

Because of the Mandatory Arbitration Clause and class action waiver provision in Section 18 of Amazon's BSA, Petitioner had no way to challenge the singular issue of whether complete forfeiture is allowed under state law. It could only do so through counsel in the arbitration and by federal appeal.

Under the laws of Washington, as with many states, a contract provision that awards a speculative penalty to a counterparty with no nexus to the quantum of loss, no attempt to measure attributable loss at any time before or after the flagged conduct, and no way for any deactivated or "blacklisted" seller to avoid the punitive and unjustified compounding result of Respondent's seizure of essential working capital in an denomination permanently and immediately in its sole discretion, is unlawful. The manner in which Respondent exercised such authorities here is unconscionable, violates public policy, and defies the plain language of controlling case law.

According to an article in Seattle Times, Amazon deactivated over 55,000 sellers' account in 2021 and seized their entire sales proceeds in the seller account on Amazon.com.[15] Per the Mandatory Arbitration

---

[15]    *See* Isobel Asher Hamilton, "Amazon shut down its program that paid warehouse 'ambassadors' to tweet positively about the company,

Clause under Section 18 of Amazon's BSA, these thousands of sellers was compelled to file arbitration demand with American Arbitration Association. Most Arbitrators ruled Section 2 was unenforceable and ordered Amazon to release the seized funds to the sellers, but still, some arbitrators sided with Amazon and ruled Section 2 was enforceable, allowing Amazon to keep the sellers' sales proceeds.

The Court's decision to render jurisprudence on this issue would help avoid a divide that is frequently occurring in the mandatory arbitrations between Amazon and its marketplace sellers over the very same underlying issues, some of which are now before the Southern District of New York. *Cowin Tech. Co., Ltd. v. Amazon.com Servs., LLC et al.*, No.1:23-cv-03054-ALC, (S.D.N.Y. 2023) This issue is also important for the life of millions of third-party sellers on Amazon.com, as this will decide whether Amazon can continue arbitrarily deactivate these sellers 'accounts and seized their entire sales proceeds, to unjust enrich itself and eliminate fair competition between Amazon's own sales and third-party sales. This issue is also important for the life of billions of American and global customers, whether they can continue enjoy the benefits of shopping from million of sellers in a fair competition

report says." Business Insider (Jan 26, 2022), available at https://www.businessinsider.com/amazon-shut-down-twitter-ambassador-program-reports-2022-1

environment which would present more affordable price and better customer experience, especially in a economic downtime time when many family's budget is tight.

## STATEMENT OF THE CASE

### I.  Facts Specific to this Action

Petitioner is a third-party seller on Amazon.com who sold various brands on Amazon, including Corlitec, Mospro, Fretree, Fitfort, Flopad and Airexpect. Petitioner is only a distributor of these brands, not the owner of these brands, as can be seen from the records of the US Patent and Trademark Office.

In August 2020, Amazon accused the Petitioner of violating its Anti-Manipulation Customer Review Policy and deactivated the Petitioner's seller account. It is Amazon's policy that a third-party seller whose selling privileges or selling have been removed or whose seller account was deactivated has the right to appeal the removal to Amazon, and Amazon will reinstate the seller's selling privileges and seller account if the seller appeals and files a viable plan of action setting forth the root causes of the policy violation, the corrective action taken to resolve the policy violation, and the prospective measures taken by the seller to prevent such a violation in the future. In other words, once a seller violated Amazon's policies, if it admits the violation and assures

Amazon no future violations will occur, Amazon will continue to work with the seller pursuant to the BSA. Petitioner successfully appealed Amazon's Year 2020 deactivation decision with a Plan of Action that Amazon accepted, and Amazon reinstated its account in 2020. (Exhibit APP 88).

Since then, the Petitioner did not engage in any type of review manipulation, nor did it have any other policy violations. However, on June 24, 2021, without any prior warning, Amazon suddenly deactivated the Petitioner's accounts and withheld the entire sales proceeds, accusing Petitioner of "manipulating customer reviews of Petitioner's products", without providing a shred of evidence. See Amazon's notice of the account deactivation in 2021, attached as Exhibit APP 82. The notice stated that "the funds in your account may be held for 90 days or more...for customer refund, chargebacks . . ." The Petitioner waited the 90 days for Amazon to handle customer refunds, chargeback, and other fees. Subsequently, on September 30, 2021, Petitioner appealed the holding of its funds after the 90-day waiting period imposed by Amazon. (Exhibit APP 88)

On October 6, 2021, Amazon notified Petitioner that its Account was in a "payment appeal period" and requested that Petitioner participates in an identity verification interview ("IPI"), which Petitioner duly completed on October 26, 2021, and during which Petitioner provided

Amazon with all information it had requested. See Exhibit APP 90. Later Petitioner declined some duplicate video interview on Petitioner's Store.

On November 4, 2021, Amazon denied the appeal, claiming that Petitioner had engaged in deceptive, fraudulent, or illegal activity (Exhibit APP 84). Petitioner denied the accusations entirely.

Upon deactivation of Petitioner's seller account, Amazon simultaneously froze Petitioner's entire sales proceeds in its seller account amounting to $380,508.61. (Exhibit APP 95)

Before account deactivation, Amazon has already collected and deducted from Petitioner's entire sales proceeds all costs and commissions it is entitled to under the BSA. Therefore, the sales proceeds in the seller account at the account blocking time belong to Petitioner, not Amazon. However, at present, Amazon still holds Petitioner's sales proceeds and refuses to release them.

## II.  Procedural History

On January 18, 2022, Petitioner filed a Demand for Arbitration before the American Arbitration Association ("AAA"), seeking the release of withheld funds by Amazon and other reliefs.

On October 7, 2022, the Arbitrator appointed by the AAA ("Arbitrator") entered a Final Award denying all of Petitioner's claims, which allowed Amazon to keep the entire sales proceeds in Petitioner's seller account. (Exhibit APP 29)

In January 2023, Petitioner filed a motion to vacate the Award with the New York Supreme Court ("the State Court"), seeking an order vacating the Final Award of the Arbitrator dated October 7, 2022, rendered before the AAA in the arbitration of *Shenzhen Lanteng Cyber Technology Co., Ltd. v. Amazon.com Services, LLC, et al.*, ICDR Case No. 01–22–0000–2374. Late on, the vacatur motion was removed to the SDNY court (the "District Court") by Amazon, and Amazon filed a cross-motion to confirm the award.

In September 2023, the District Court judge issued a decision denying the vacatur motion and granting Amazon's motion to confirm.

In October 2023, Petitioner filed a notice of Appeal, seeking an order from this Court to reverse the District Court's decision and vacate the arbitral award and to order that Amazon release the illegally seized funds back to the Petitioner.

## STANDARD OF REVIEW

This Court shall review the district court's decision to vacate or confirm an arbitration award *De Vono* on questions of law and for clear error on finding of facts. *See Nat'l Football League Mgmt. Council v.*

18

*Nat'l Football League Players Ass'n*, 820 F.3d 527 (2d Cir. 2016) (quotation omitted) Because the dispute involves an international party, Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 ("New York Convention") apply to this case. *See Scandinavian*, 668 F.3d at 60.

Since the governing contract, the BSA, has a choice of law clause designating Washington law as the governing law for any dispute arising out of the contract, the Washington law should be applied in determining the enforceability of clauses under BSA.

## ARGUMENT

### Part 1 Manifest Disregard of Law

The District Court erred in holding that the Arbitrator did not manifestly disregard the law. Therefore, this Court must reverse the District Court's decision and vacate the arbitral award. Section 2 of the BSA is an unenforceable penalty clause under Washington laws, and there is no colorable justification for an alternative interpretation.

A party seeking to vacate an arbitration award under the manifest disregard standard must show "something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law." *Westerbeke Corp. v. Daihatsu Motor Co. Ltd.*, 304 F.3d 200, 208 (2d Cir. 2002). To modify or vacate an award on

the ground of manifest disregard of the law, a court must find "both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case". See *Wallace v. Buttar*, 378 F.3d 182, 189 (2d Cir. 2004). Even if a court disagrees with the arbitrator's decision on the merits, "if there is a barely colorable justification for the outcome," then the award should be enforced. *Id.* at 190 (quoting *Banco de Seguros del Estado v. Mut. Marine Office, Inc.*, 344 F.3d 255, 260 (2d Cir. 2003)).

In this case, the Arbitrator knew of the well-defined governing legal principle because it was included in the briefs and mentioned in the award. However, the Arbitrator factually ignored the legal principle because there is no colorable justification for the outcome.

## I. Section 2 of the BSA is an unenforceable penalty clause under Washington law.

The Petitioner has been victimized by the vague terms in Section 2 which essentially describe a discretionary forfeiture. As the author of the BSA, Amazon is bound by its drafting failure. Section 2 is certainly not a liquidated damages provision because it is an unenforceable penalty clause. Liquidated damages clauses usually explicitly disclaim that the amount payable is not a penalty or forfeiture, typically designating the amount to be paid "as liquidated damages and not as a

penalty or forfeiture." See, e.g., *Forest Mktg. Enters., Inc. v. State, Dep't of Natural Res.*, 125 Wash.App. 126, 131, 104 P.3d 40, 43 (2005) (liquidated damages clause provided that "these payments are agreed to as liquidated damages and not as penalties")

*Watson v. Ingram* sets forth the standard to determine whether a liquidated damages clause is enforceable: "Washington courts have applied a 2-part test from the Restatement of Contracts § 339, at 552 (1932). Liquidated damages clauses are upheld if the following two factors are both satisfied: 'First, the amount fixed must be a reasonable forecast of just compensation for the harm that is caused by the breach. Second, the harm must be such that it is incapable or very difficult of ascertainment.'" (Internal citations omitted.) *Watson v. Ingram*, 124 Wash.2d 845, 850, 881 P.2d 247, 249 (1994). The reasonableness of a forecast of damages in a liquidated damages clause is judged prospectively—i.e., as of the time the contract was entered. *Id.* at 851.

The central concept is that "a provision in a contract which bears no reasonable relation to actual damages will be construed as a penalty." *Walter Implement, Inc. v. Focht*, 107 Wash.2d 553, 559 (1987) "A term fixing unreasonably large, liquidated damages is void as a penalty." *Forest Mktg. Enters., Inc. v. State, Dep't of Natural Res.*, 125 Wash.App. at 136 The 'liquidated sum' must 'represent a good faith effort by the parties to appraise the benefit of the bargain.' *In Re Late Fee & Over-Limit Fee Litig.*, 741 F.3d 1022, 1026 (9th Cir 2014). The

reasonableness of the liquidated sum will be judged as of the time the contract was *entered. Id.* Penalty clauses 'are generally not enforceable.' *See Id. See also Walter,* at 558.

In our case, Amazon's language in Section 2 of the BSA provides that 'If we determine that your account—or any other account you have operated—has been used to engage in deceptive, fraudulent, or illegal activity (including the sale of counterfeit goods), or to repeatedly violate our Program Policies, then we may in our *sole discretion* permanently withhold **any** payments to you.' (Exhibit APP 32). *Any* payment is not a fixed amount of damage. It is a catch-all phrase granting Amazon an unlimited and undefined amount of damages. Thus, it bears no reasonable relation to actual damage suffered because Amazon, as the author of the BSA failed to make a good-faith effort to determine a reasonable forecast of damage. Therefore, Section 2 of the BSA should be construed as a penalty clause under *Walter.*

Amazon can terminate a Seller on any date it alone selects. It defies logic that in each instance, the amount of Seller funds it is holding is a reasonable forecast of fair compensation it is entitled to hold back for the harm caused by any alleged breach of the BSA. There are at least six reasons why Amazon's position defies logic and fairness:

1. The amount of sale proceeds that await remittance in seller accounts vary by orders of magnitude due to differences in sale volumes. At any particular moment in time, some accounts will contain a

22

minuscule amount awaiting remittance, some will contain tens of thousands, some (like Seller's in this case) will contain hundreds of thousands, and some will contain millions.

2. The sale proceeds that await disbursement also vary according to the time at which Amazon announces its decision to withhold funds. Of course, Amazon has the power to control this variable. It can routinely time termination to correspond to the date a disbursement would otherwise have been due or right after Amazon Prime Date Sales or holiday sales, thereby maximizing its "compensation". During the mass blocking of Seller accounts in 2021, many Sellers' accounts were blocked right after Amazon Prime Day. Amazon's absolute power resulted in maximizing its recovery against thousands of small foreign Sellers.

3. Amazon's description of liquidated damages does not consider the tremendous variations in the nature, scope, and duration of misconduct that constitute a breach of the BSA. There is neither a rational nor proportional relationship between the amount of proceeds withheld and any alleged breaches. A Seller with limited proceeds in its account may engage in offensive infractions, yet a Seller who earned multi-million dollars in sales may be forced to forfeit the funds for minor or unsupportable allegations of infractions. In the end, the terms of Section 2 allow Amazon a disproportional amount of power against a Seller. It is difficult to square this result with a "reasonable forecast" of actual damages.

4. Amazon asserted in the arbitration, which the Arbitrator considered, that because it withholds sale proceeds that accrue over a limited period ("generally" 14 days), it "withheld only a small fraction of Seller's sale proceeds." However, Section 2 does not describe liquidated damages as a specified percentage of a Seller's total sale proceeds. It is also not necessarily true that sale proceeds for a 14-day period will be a "small fraction" of a Seller's sales. Claimant's experience indicates that sale proceeds may increase dramatically with time. Deactivating an account and withholding sales proceeds at an inopportune time for the Seller may affect a much larger percentage of its total proceeds than would otherwise be the case. In any event, the test is not the percentage of a Seller's total sale proceeds the amount of liquidated damages represents; it is whether that amount is a reasonable forecast of actual damages.

5. The liquidated damages clause in Section 2 does not say Amazon shall withhold only 14 days of sale proceeds. Rather, it provides that Amazon can performantly withhold *"any payment"* in the Seller's account. The proceeds subject to Section 2 are those that have accumulated in whatever period of time has passed since Amazon's most recent remittance to the Seller. As a practical matter, the period between remittances can exceed 14 days if one of many possible technical or logistical problems with electronic funds transmission develops. In addition, the BSA provides that the Remittance

24

Calculation Date (defined as two business days prior to the date of remittance) may be deferred up to 14 days, be doubled to 30 days, or even longer for a variety of business reasons.

6. Even if it is assumed that the period during which sale proceeds accrue before deactivation and withholding is uniformly 14 days, Amazon offers no rationale as to why it must be 14 days instead of 5, 21, or 30 days. Fourteen days is simply the period during which proceeds "generally" accrue before remittance to some Sellers and which, therefore, corresponds with the amount of proceeds easily available to Amazon. This arbitrary timing does not pass the reasonable forecast test.

The clause does not in any way take pains to distinguish the amount to be paid thereunder from a penalty or forfeiture, allude to the test for the validity of a liquidated damages clause, or explain how the parties' relationship satisfies that test. Indeed, the language does not even suggest, much less express, that the amount withheld and appropriated serves as reasonable or fair compensation to Amazon. These drafting deficiencies confirmed that Amazon really intended Section 2 to serve as a penalty clause.

The question becomes more pointed upon review of Amazon's Anti-Manipulation Policy for Customer Reviews, an applicable program policy that the BSA incorporates, which provides: "If *we determine* that an Amazon account has been used to engage in review manipulation

25

and remittances, payments may be withheld or *forfeited*" (italics added). Likewise, Amazon's Seller Code of Conduct provides: "Violating the Code of Conduct or any other Amazon policies may result in actions against your account, such as cancellation of listings, suspension or *forfeiture of payments*, and removal of selling privileges" (italics added). There is no doubt that Amazon actually considers withholding the Claimant's sales proceeds as a penalty and forfeiture.

In addition, Section 2 states that "we *may* in our sole discretion permanently withhold any payments to you," (italics added) plainly indicates that its invocation of the clause is optional. This discretionary language further undermines any attempt to characterize Section 2 as liquidated damages. "While a few courts have ruled that sophisticated parties may agree to optional liquidated damages clauses, … the majority rule is that such clauses are unenforceable." *See* J.M. Perillo, Calamari, and Perillo on Contracts § 14–32 (6th ed. 2009) (optional liquidated damages provisions "have been struck down as they do not involve a reasonable attempt definitively to estimate the loss"). Also, optional liquidated damages clauses are also legally flawed because they can be invoked selectively when liquidated damages exceed provable actual damages.[16]

---

[16] Part of Section A is cited from "Final Award" in *Dongguan Likaixiao Technology Co., Ltd. v. Amazon, et al.* (ICDR Case No. 01-21-0018-1838) dated January 30, 2023.

For the reasons above, in any event, BSA Section 2 is clearly an unenforceable penalty clause.

## II.   The Arbitrator Did Manifestly Disregard the Law

The Arbitrator clearly ignored well-defined legal principles. As demonstrated above, well-defined legal principles have clearly shown that BSA Section 2 is not a liquidated damage clause. Under Washington law, BSA Section 2 is no doubt an unenforceable penalty clause.

The District Court found that 'Arbitrator addressed each of these [lanteng's] argument in turn.' This is wrong. The Arbitrator did not address lanteng's argument and certainly did not respond to Lanteng's argument.

In the Arbitral Award, the Arbitrator failed to recognize these well-defined legal principles. The Arbitrator ruled on this issue in simple sentences with no reasoning, as below.

> Washington law favors liquidated damages provisions and courts routinely uphold them where (1) the amount is "a reasonable forecast of just compensation for the harm that is caused by the breach," and (2) the harm is "incapable or very difficult of ascertainment." *Watson v. Ingram*, 124 Wn.2d 845, 850 (1994). Here, the BSA's terms were a reasonable forecast of the harm caused by a breach of the BSA at the time the parties entered into the BSA. Moreover, the harm caused by a breach of the BSA was not capable of being

27

> assessed at the time the parties entered into the BSA. I do
> not find that section 2 of the BSA is an unenforceable
> penalty clause.

Simply listing out a two-sentence standard from a single decision does not mean that the Arbitrator 'applied' it. The Arbitrator outlined the *Watson* standard, which means that the Arbitrator knew of the governing legal principle. *Wallace*, 378 F.3d at 189. However, the Arbitrator then simply states that the term was a reasonable forecast, and the damage is difficult to ascertain without even bothering to explain any reasoning supporting his findings. The arbitrator cited no facts and made no analysis. The arbitrator did not address the arguments from either party. This must not be considered that the Arbitrator 'applied' the law.

In addition, the Arbitrator cited only one case in its analysis. One case does not provide a well-defined legal principle. The only case that the Arbitrator cited also fails to provide well-defined legal principle for the case. The provision of BSA Section 2 is drastically different from the provision in dispute in *Watson*. In *Watson,* the court ruled that the contract in dispute contained an enforceable liquidated damage clause where the contract not only fixed the amount of damage to $15,000 but also contained the contract language specifically designated the damage as liquidated damages. *Watson*, 124 Wash.2d at 850. (quoting *Walter*, 107 Wash.2d at 559) (Finding that contract language designating

damage as liquidated damage is given serious consideration in determining an enforceable liquidated damage clause) However, the damage under BSA Section 2 is as defined vaguely as *any payment,* and BSA Section 2 contains no language designating *any payment* as liquidated damages. Therefore, the Arbitrator also did not 'apply a well-defined legal principle'.

The well-defined legal principle of how to determine whether a contract clause is an unenforceable penalty clause has been outlined above and provided in the Arbitration brief submitted by the Petitioner to the Arbitrator. However, the Arbitrator clearly ignored the well-defined legal principle, and refuse to apply it. Under *Wallace,* this Court must find that the Arbitrator manifestly disregarded the law and reverse the district court's decision. *Wallace*, 378 F.3d at 189.

## Part 2 Violation of Public Policy

The District Court misinterpreted Petitioner's argument and erred in holding that Petitioner's argument does not justify vacatur of the Award. Enforcement of the award violates strong public policy. Therefore, this Court must reverse the District Court's decision and vacate the arbitral award.

A court may vacate an arbitral award if it violates public policy. See *Cabrini Med. Ctr. v. Local 1199, Drug, Hosp. & Health Care Empls. Union, RWSDU*, 731 F.Supp. 612, 616 (S.D.N.Y. 1990). The first step to

determine whether an arbitration award violates public policy is to identify the public policy. *W.R. Grace & Co. v. Loc. Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 766, 103 S. Ct. 2177, 76 L. Ed.2d 298 (1983) The public policy must be well-defined and dominant as "ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Id.* After the public policy is identified, a court should look at whether enforcing such an arbitration award would violate that policy. *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 43, 108 S. Ct. 364, 98 L. Ed.2d 286 (1987) A court need not look into the arbitrator's reasonings. *Id.* If enforcing the arbitration award "would violate our most basic notions of morality and justice," the arbitration award must be vacated. *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 315 (2d Cir. 1998)

In this case, the Petitioner argued that BSA Section 2 violates strong public policy, and more importantly, that enforcing an arbitration award upholding its validity violates public policy. This is in line with the Supreme Court's rulings. Therefore, the district court erred in denying Petitioner's argument.

### a. Enforcement of the arbitration award violates public policy under Washington Law's 6-Factor Balancing Test.

In the case of *In re Potential Dynamix LLC*, No. 2:11-BK-28944-DPC, 2022 WL 18635242, at *1 (Bankr. D. Ariz. July 18, 2022), the court persuasively observed that to determine whether an agreement is likely to be declared invalid on public policy grounds, Washington law applies a 6-factor balancing test. *Riley v. Iron Gate Self Storage*, 198 Wash.App. 692, 701, 395 P.3d 1059, 1065 (2017)

The court in *Potential Dynamix LLC* ruled that Section 8 of the BSA is unenforceable because it triggers the following six factors:

1. Amazon operates in a regulated industry and must comply with a myriad of statutory and regulatory requirements. *In re Potential Dynamix LLC*, 2022 WL 18635242, at *1.

2. Amazon is the dominant online platform for internet sales of almost any product one can imagine. Thus, for these purposes, Amazon provides an essential or necessary public service, especially during the current pandemic and e-commerce era. *Id.*

31

"A common thread runs through those cases in which exculpatory agreements have been found to be void as against public policy ... they are all essential public services - hospitals, housing, public utilities, and public education." *Id. Citing Shields v. Sta-Fit, Inc.*, 79 Wash.App. 584, 589 (1995)).

1. Amazon holds itself out to the general public as willing to sell its services to any member of the public who seeks it, subject to certain limitations. *Id.*

2. Whether or not Amazon's platform is considered essential, it does possess a decisive advantage in bargaining strength. Although the Debtors could have taken its business elsewhere if they disagreed with the provisions found in the Agreement, there really is no comparable internet-based channel it could have used to sell its tens of thousands of products. In the world of e-commerce, Amazon is the go-to online shopping platform. That said, the Debtor did nominally have the option of taking its business elsewhere. *Id.*

3. This factor requires a finding of an adhesion contract. Washington courts consider the following in determining whether a contract is an adhesion contract: "(1) whether the contract is a standard form printed contract, (2) whether it was prepared by one party and submitted to the other on a take it or leave it basis, and (3) whether there was no true equality of bargaining power between the parties." *Id. Citing Zuver v. Airtouch Commc'ns, Inc.*, 153 Wash.2d 293, 103 P.3d 753 (2004).

The Agreement was a standardized form that bound a customer to its terms merely by using Amazon's services. There was no possibility that the Debtor could modify any terms or provisions in the Agreement,

there could be no negotiation, and no signatures were required. The Agreement was truly a "take it or leave it" proposition. The Agreement is an adhesion contract. *Id.*

6. Under the Agreement, Amazon gained exclusive control over the Debtor's inventory. This fact placed the Debtor under the tight control of Amazon. *Id.*

At least 5, and possibly 6, of the Washington factors, point towards recognition that its public policy is violated by the liability limitation contained in Section 8 of the parties' Agreement. Accordingly, the court found that Section 8 of the BSA is unenforceable as it violates Washington's public policy and violates the 3rd requirement if the Clause were to be enforceable." *Id.* Therefore, Section 8 of the BSA does not shield Amazon from compensating the Claimant for Amazon's breach of the BSA.

In our case, Section 8 of the BSA is not at issue. Rather, the unconscionable and unenforceable clauses in section 2 of the BSA that gives Amazon the absolute power to destroy the livelihood of third-party sellers are at issue in our case. However, the same analysis also applies to BSA Section 2 because the analysis in essence reflects how Amazon abuses its monopoly power to abuse third-party sellers. As the Arizona Bankruptcy court observed, Amazon is the dominant online platform for internet sales of almost any product one can imagine. *Id.* It reportedly

controls 65% to 70% of all U.S. online marketplace sales.[17] As Amazon possesses such dominance, small retailers do not have any viable or meaningful choice other than to accept Amazon's terms should they wish to get their products in front of online consumers on Amazon's online retail platform.[18]

The Washington Law's 6-factor balancing test analysis of Section 8 and 2 of Amazon's BSA showed the violation of a well-defined public policy. The persuasive ruling from the Arizona Bankruptcy Court showed that Amazon's absolute control over the Sellers violate that public policy. The Petitioner fought hard for justice, while the Arbitrator insisted on denying Petitioner's rights to its own funds and refused to order that Amazon return the illegally seized funds to the Petitioner. Enforcement of this arbitration award is obviously against justice and against the strong public policy under the Washington Law. Therefore, the district court's decision to deny Petitioner's motion to vacate must be reversed.

---

[17]    *See "Investigation of Competition in Digital Markets,"* Majority Staff Report and Recommendations, House Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary (Oct. 6, 2020) (hereinafter referred to as the "House Report"), available at: https://www.govinfo.gov/content/pkg/CPRT- 117HPRT47832/pdf/ CPRT-117HPRT47832.pdf.

[18]    Marcia Savage, *"Amazon's e-commerce dominance: Is the price too high?",* THE FUTURE OF COMMERCE (January 28, 2022), available at https://www.the-future-of-commerce.com/2022/01/28/amazons-e-commerce- dominance-is-the-price-too-high.

Also, the enforcement of the arbitral award harms public interest including fair competition and customer protection. Before an independent merchant can open a third-party seller account ("Account") on the Amazon Platform, all third-party sellers must fully accept the terms and conditions set forth in the BSA, having no negotiation power regarding the fairness and enforceability of the contract terms.

Firstly, Amazon's adhesion contract (the BSA) contains

- Section 3, entitling Amazon to deactivate **any** seller account at **any** time **at will**;
- Section 8, exonerating Amazon from any liability related to the BSA;
- Section 2, entitling Amazon to *seize any sales proceeds* in the account, whenever Amazon solely determines that the seller has violated the BSA terms; and
- Section 18, *mandatory arbitration clause and class action waiver clause*, forcing sellers to go through expensive arbitration on an individual case basis for any dispute, to thwart thousands of sellers initiating cost-effective class or group action in the arbitration to access judicial remedies Many sellers, already financially strained by abrupt account deactivation and consequent loss of revenue and access to its funds, are forced to abandon their pursuit of justice due to the prohibitive cost of arbitration on an individual case basis.

Amazon has been conducting unfair business practice of abrupt and arbitrary account deactivation and fund seizing.

First, Amazon blocked sellers' accounts to a full extent, using reckless and aggressive methods. Not only does Account suspension or

35

deactivation/delisting mean that third-party sellers can no longer sell their products on the Amazon Platform, but it may also be accompanied by Amazon's indefinite or permanent withholding of previously unremitted sales proceeds pursuant to Section 2 of the BSA, as well as its destruction or other disposition of a seller's inventory pursuant to Section F-7.2 of the BSA.

Second, Amazon uses auto mechanism technology to detect policy violations on Amazon.com. Once the auto mechanism flags a violation, the system sends an auto message to the seller and the seller's account may get deactivation immediately. Amazon provides no evidence to support its accusations in the account deactivation notification message. And, Amazon's violation detection technology is not perfect, though. In its quest to uproot nefarious sellers operating through multiple accounts, Amazon's algorithms generate "a tremendous number of false positives."[19] Once Amazon has determined that two accounts are connected, it can be difficult to prove they are not. That is what happened to Chukar Cherries, one of the Washington sellers who is the victim of Amazon's arbitrary account blocking.[20]

---

[19] Katherine Anne Long, "Amazon abruptly banned Washington state treat-maker Chukar Cherries. Months of appeals went unheeded," The Seattle Times (Sept. 27, 2021), available at https://www.seattletimes.com/business/amazon/amazon-abruptly-banned-washingtonstate-treat-maker-chukar-cherries-months-of-appeals-went-unheeded. (Para 24-28)

[20] Id.

Third, generally, there is NO advance notice and due process before account deactivation. These sellers' accounts were blocked abruptly. Also, their sales proceeds in the seller account were seized by Amazon, they did not have access to the funds and could not afford to pay vendor bills and other bills anymore.

Third, once the seller account is blocked, there is no valid appeal process. Chukar general manager Tim Oten spent more than two months trying to prove his company had no relationship with another seller. Over and over, he received an automated response: Amazon had "received your submission but (did) not have enough information to reactivate your account at this time."[21]

In summary, Amazon conducts monopoly and unfair trade and business practices when dealing with the third-party sellers, breaches the good faith and fair dealing obligation under its BSA, and abuses its market dominance in the seller account blocking and fund seizing, which harm fair competition that millions of third-party and customers are entitled to. The enforcement of this arbitration awards would harm public interests, i.e., fair competition and customer protections. Therefore, the district court's decision to deny Petitioner's motion to vacate must be reversed.

---

[21]  *Id.*

# CONCLUSION

In light of the foregoing reasons, it is clear that the District Court erred in finding that the Arbitration did not manifestly disregard the law, and that Petitioner's violation of public policy argument does not justify vacatur of the arbitration award. Accordingly, the decisions of the District Court denying Petitioner's motion to vacate must be reversed.

Respectfully submitted,

Dated: February 15, 2024      By: /s/ Julie Guo

*Attorney for Petitioner - Appellant*
SHENZHEN LANTENG CYBER TECHNOLOGY CO., LTD.

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains **7,983 words**, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface, **14-pt Century Schoolbook**, using TypeLaw.com's legal text editor.

Dated: February 15, 2024          By: /s/ Julie Guo _____

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2024, I filed and served the foregoing **APPELLANT'S BRIEF** with the Clerk of the Court by causing a copy to be electronically filed via the appellate CM/ ECF system. I also hereby certify that the participants in the case are registered CM/ECF users and will be served via the CM/ECF system.

Dated: February 15, 2024            By: /s/ Julie Guo

# No. 23-7593

## In the United States Court of Appeals for the Second Circuit

SHENZHEN LANTENG CYBER TECHNOLOGY CO., LTD.,

*Petitioner-Appellant,*

v.

AMAZON.COM SERVICES, LLC, A DELAWARE LIMITED LIABILITY COMPANY, AMAZON.COM, INC., A DELAWARE CORPORATION,

*Respondent-Appellees.*

On Appeal from the United States District Court
for the Southern District of New York
No. 1:23-cv-00991-GHW
Hon. GREGORY H. WOODS

## SPECIAL APPENDIX

Julie Guo
200 E 36th Street, Suite 16A
New York, NY 10016
Jslawusa@gmail.com
Telephone: (917) 773-1868
*Attorney for Petitioner - Appellant*
SHENZHEN LANTENG CYBER TECHNOLOGY CO., LTD.

## Table of Contents

| Tab | Description | Date | Vol. | Page |
|-----|-------------|------|------|------|
| 1 | Memorandum Opinion and Order of Honorable Gregory H. Woods | 09/26/2023 | 1 | SPA 1 |
| 2 | Entered Judgement Against Lanteng | 09/26/2023 | 1 | SPA 20 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/26/2023
```

------------------------------------------------------------ X
                            :
SHENZHEN LANTENG CYBER          :
TECHNOLOGY CO., LTD.,             :
                            :               1:23-cv-991-GHW
                Petitioner,   :
                            :      MEMORANDUM OPINION
            -v -                  :        AND ORDER
                            :
AMAZON.COM SERVICES, LLC and  :
AMAZON.COM, INC.,            :
                            :
            Respondents.  :
                            :
------------------------------------------------------------ X

GREGORY H. WOODS, United States District Judge:

Shenzhen Lanteng Cyber Technology Co., Ltd. ("Lanteng") initiated this action seeking to

vacate an arbitration award entered in favor of respondents Amazon.com Services LLC and

Amazon.com, Inc. (collectively "Amazon").  Amazon cross-petitions the Court to confirm the

underlying arbitration award.  Because the arbitration award is clearly within the arbitrator's

authority and does not reflect a manifest disregard of the law, Lanteng's petition to vacate the

arbitration award is DENIED and Amazon's cross-petition to confirm the award is GRANTED.

**I.**       **BACKGROUND**

       **A.**     **The Business Services Agreement**

Lanteng is Chinese company with its principal place of business in Shenzhen, China.

Declaration of Jiaoyu Cheng, Dkt. No. 21 ("Cheng Decl.") ¶ 2.  Since June 2018, Lanteng has

operated as a third-party seller in Amazon's online marketplace.  *Id.* ¶ 3; Declaration of Michael

Guerrero, Dkt. No. 28-2 ("Guerrero Decl.") ¶ 9.  To sell on Amazon's online marketplace, Lanteng

had to agree to Amazon's "Business Solutions Agreement" (the "BSA").  *Id.*; *see also* Dkt. No. 28-3

(BSA).

**SPA 1**

Amazon asserts that all third-party sellers on the Amazon platform are required to abide by the terms and conditions of the BSA and its incorporated policies.  Dkt. No. 27 (the "Opposition") at 2.  Amazon's position is that the requirement helps to "maintain the integrity of its only store and brand, which depends on customer trust."  *Id.*

As relevant here, the BSA contains provisions that penalize sellers when they engage in fraudulent conduct on the platform.  Section 2 of the BSA permits Amazon to withhold payments to sellers who engage in fraud:  "If we determine that your account—or any other account you have operated—has been used to engage in deceptive, fraudulent, or illegal activity (including the sale of counterfeit goods), or to repeatedly violate our Program Policies, then we may in our sole discretion permanently withhold any payments to you."  BSA § 2.

Section 3 of the BSA grants Amazon authority to block the account of a seller that engages in fraudulent activity:

> We [i.e., Amazon] may suspend or terminate your account or this Agreement immediately if we determine that (a) you have materially breached the Agreement and failed to cure within 7 days of a cure notice . . . ; (b) your account has been, or our controls identify that it may be used for deceptive or fraudulent, or illegal activity . . .

BSA § 3.  The BSA also requires sellers to verify their identity at Amazon's request.  BSA § P-4 ("We may at any time require you to provide any financial, business or personal information we request to verify your identity").

Third-party sellers like Lanteng are also subject to Amazon's "customer product reviews policies."  Dkt. No. 28-4.  A seller violates those policies when, among other things, the "seller offers a third party a financial reward, discount, free products, or other compensation in exchange for a review on their product or their competitor's product."  *Id.* at 3–4.  Amazon has a "zero-tolerance policy" toward violations of the customer review policy:  "If we detect any attempts to manipulate customer reviews, we take immediate actions that include, but are not limited to:

immediate and permanent withdrawal of the seller's selling privileges on Amazon and withholding of funds." *Id.* at 4.

The BSA requires that the parties resolve any dispute relating in any way to the BSA or Amazon's services through arbitration. BSA § 18 ("**Amazon and you both consent that any dispute with Amazon or its Affiliates or claim relating in any way to this Agreement or your use of the Services will be resolved by binding arbitration as described in this paragraph, rather than in court** . . . .") *Id.* (emphasis in original). The contract provides that any "arbitration will be conducted by the American Arbitration Association (AAA) under its commercial rules." *Id.* The BSA specifies the governing law as "the Laws of the State of Washington, United States together with the Federal Arbitration Act and other applicable federal law." *Id.* (Definition of "Governing Laws").

### B.   Lanteng's Fraudulent Conduct

Lanteng's account of the events that led to this application begins in 2020. Lanteng asserts that in August 2020, Amazon accused Lanteng of violating Amazon's customer product reviews policies. Dkt. No. 20 ("P's Mem.") ¶ 13. Lanteng asserts that it successfully appealed Amazon's 2020 deactivation decision to Amazon, and after Amazon accepted its "Plan of Action,"[1] Amazon reinstated Lanteng's seller account. *Id.*

In late 2021, Amazon again blocked Lanteng's account, accusing Lanteng of manipulating customer reviews. Cheng Decl. ¶ 14; Guerrero Decl. ¶ 10.[2] When the account was blocked,

---

[1] Lanteng describes the "Plan of Action" as a plan created by sellers who have been accused of a violation of Amazon's policies. The plan involves explaining the reasons behind the action, how the company plans to resolve it, and measures taken to prevent it from happening in the future. P's Mem. ¶ 13; *see also* Dkt. No. 18-3.

[2] There is some dispute regarding the date of the suspension: Lanteng asserts that the account was suspended on June 24, 2021, Cheng Decl. ¶ 11, while Amazon asserts that the account was suspended in September. Guerrero Decl. ¶ 10. This dispute is immaterial to the resolution of this motion.

**SPA 3**

"Amazon withheld $123,622.24 in funds, representing approximately two weeks' worth of funds awaiting disbursement in the seller account." Guerrero Decl. ¶ 13.

Amazon provided Lanteng the opportunity to appeal the suspension of its account. *Id.* Lanteng did so. However, in its appeal, Lanteng "admitted that it manipulated customer feedback by bribing customers in exchange for falsified positive reviews and for the removal of negative reviews." Arbitration Award, Dkt. No. 28-13 (the "Award") at 2; Dkt. No. 28-5, Ex. E at 4–5.

Amazon asked to interview Jiaoyu Cheng, the registered account holder, to verify her identity as the account holder,. Cheng Decl. ¶ 14. According to Amazon, a "person professing to be Jiaoyu Cheng" appeared for the interview but "did not even have the most basic knowledge about the Lanteng organization." Guerrero Decl. ¶ 16. The interviewee "could not correctly answer any basic account registration questions, did not know why the Amazon account had been suspended, and could not speak with knowledge of any element of the Lanteng business." *Id.* Amazon requested that Ms. Cheng participate in a second interview. Ms. Cheng declined. She now contends that she declined to follow through with a second interview because "[she] had already participated in the process." Cheng Decl. ¶ 14.

Upon a review of the facts, however, the arbitrator found that Amazon "presented compelling evidence that Ms. Cheng failed to prove she was the owner or operator of Claimant's account at her IPI interview." Award at 2. The arbitrator also found that Amazon's version of events was "further supported by the lack of knowledge Ms. Cheng had concerning Claimant when she was deposed . . . . Her testimony was not consistent with the declaration that was offered by Claimant to support its position in this arbitration." *Id.* Amazon denied Lanteng's appeal, deactivated its seller account, and froze its funds. P's Mem. ¶¶ 17–18.

In January 2022, Lanteng filed a demand for arbitration with the AAA, seeking to retrieve the withheld funds. *Id.* ¶ 20; *see also* Dkt. No. 28-6 (the "Arbitration Demand"). In its demand,

4

**SPA 4**

Lanteng asserted that its account had been suspended improperly and that its funds were being improperly withheld.  *Id.*  Lanteng also contended in the arbitration demand that the BSA was a contract of adhesion that was procedurally and substantively unconscionable.  *Id.* ¶ 7

In response to the demand, John Bonello (the "Arbitrator") was appointed to arbitrate the dispute.  Dkt. No. 28-7.  Lanteng elected to conduct the arbitration by written submissions rather than by an in-person hearing.  Dkt. No. 28-9 ¶ 1.  The parties then engaged in extensive briefing regarding the dispute and presented evidence to the Arbitrator in support of their respective positions.

In its brief to the arbitrator, Lanteng reiterated its arguments that the BSA was not enforceable.  *See* Dkt. No. 28-10 ("Claimant's Arbitration Brief").  Among other things, Lanteng argued that Section 2 of the BSA was procedurally and substantively unconscionable and that the provision should be found to be unenforceable as a penalty provision.  *Id.* at 8–9.  Lanteng also argued that Amazon had breached the BSA because it had "fail[ed] to disburse sales proceeds and reimbursements."  *Id.* at 7.  Amazon's opposition brief responded to Lanteng's arguments that the BSA was unconscionable at length.  Dkt. No. 28-11 at 7–10.  Lanteng renewed its arguments to the contrary in its reply brief.  Dkt. No. 28-12 at 8–10.

On October 7, 2022, the Arbitrator issued the final Award.  In it, he denied Lanteng's claims in their entirety.  The Arbitrator began by addressing the arguments presented by Lanteng regarding the enforceability of the BSA.  First, the Arbitrator considered Lanteng's argument that the BSA was unconscionable under Washington law.  Award at 1.  He concluded that it was not.  To reach that conclusion, the arbitrator first evaluated Washington State law.  He cited to an *en banc* decision by the Supreme Court of Washington State and, based on it, defined procedural unconscionability as a "lack of meaningful choice, considering all the circumstances surrounding the transaction including the manner in which the contract was entered into."  *Id.* (citation omitted).  The Arbitrator evaluated

5

the facts presented to him in the hearing and found that Lanteng "made a choice to enter into the BSA knowing the terms and condition and could have decided not to sell on [Amazon's] platform." *Id.* He determined, therefore, that "[t]he facts do not support a finding of procedural unconscionability with respect to the BSA." *Id.*

The Arbitrator next found that the BSA was not substantively unconscionable. *Id.* He cited to another *en banc* decision of the Supreme Court of Washington State, which held that "[s]ubstantive unconscionability involves those cases where a clause or term in the contract is alleged to be one-sided or overly harsh." *Id.* (citation omitted) (alteration in the original). Evaluated under governing Washington State law, the Arbitrator found that Lanteng "has failed to prove that section 2 of the BSA was substantively unconscionable." *Id.* The Arbitrator ruled that that there was "nothing one-sided or overly harsh with" Amazon "conditioning disbursements of funds" on Lanteng's compliance with Amazons' seller policies regarding non-deceptive behavior. *Id.* He concluded that the facts "do not support a finding of substantive unconscionability with respect to the BSA." *Id.*

The Arbitrator went on to evaluate Lanteng's argument that Section 2 of the BSA was an unenforceable penalty provision. Ruling against Lanteng, the Arbitrator found that Section 2 of the BSA was a valid liquidated damages provision. *Id.* at 2. With respect to this issue too, the Arbitrator's Award specifically cited to an *en banc* opinion by the Supreme Court of Washington State to support his legal analysis. The Arbitrator concluded that Washington law "favors liquidated damages provisions" and that "courts routinely uphold" such awards "where (1) the amount is 'a reasonable forecast of just compensation for the harm that is caused by the breach,' and (2) the harm is 'incapable or very difficult of ascertainment.'" *Id.* at 2 (citation omitted). He found that the BSA's terms were "a reasonable forecast of the harm caused by a breach of the BSA at the time the parties entered into the BSA" and that the harm caused by a breach of the BSA "was not capable of

6

being assessed at the time the parties entered into the BSA." *Id.* He determined that Section 2 of the BSA did not constitute an unenforceable penalty clause. *Id.*

Finally, the Arbitrator found that Amazon was justified in withholding Lanteng's funds under Section 2 of the BSA because Lanteng had violated the BSA's customer review policies and identity verification requirements. *Id.* He found that Section 2 of the BSA authorized Amazon to withhold Lanteng's funds if Lanteng engaged in deceptive, fraudulent, or illegal activity or violated program policies that are incorporated in the BSA. *Id.* He further found that the BSA and the program policies it incorporated prohibited sellers from offering compensation in exchange for reviews and requires sellers to verify their identity upon Amazon's request. *Id.*

The Arbitrator then reviewed the facts, including the fact that Lanteng "admitted . . . that it manipulated customer feedback by bribing customers in exchange for falsified positive reviews and removal of honest negative ones," and found that Lanteng had violated Amazon's customer review policies. *Id.* He also reviewed the facts concerning Amazon's request for Lanteng to verify its identity, finding that Lanteng failed to verity its identity as required under the BSA. *Id.* He determined that Lanteng's violations of these policies placed Amazon "well within its contractual rights to withhold [Lanteng's] funds." *Id.* As a result, the Arbitrator denied Lanteng's claim for breach of contract and its remaining claims. Lanteng asserts that as a consequence of the Award, Amazon has been awarded $380,508.61 of its funds. P's Mem. at 15.

### C.   Procedural History

On January 7, 2023, Lanteng filed a petition to vacate the Award in the Supreme Court of the State of New York, County of New York. *See* Dkt. No. 1. Amazon removed the action to this Court on February 6, 2023. *See id.* at ¶¶ 4–15. On March 1, 2023, the Court held a conference concerning this case. Dkt. No. 7. During that conference, the Court observed that Lanteng's briefing relied on New York State law. As a result, the Court offered Lanteng the opportunity to

**SPA 7**

submit a revised brief supported by appropriate references to the federal law that would govern the Court's evaluation of the application. *See* Dkt. No. 24 at 27:11–17. Lanteng said that it wished to do so. As a result, the Court granted Lanteng additional time to file an updated brief and supporting materials informed by the governing legal standard.

On April 12, 2023, Lanteng filed an amended brief in supports of its petition to vacate the Award. *See* P's Mem. Lanteng's new memorandum of law continues to cite to state law, rather than federal law for the governing standard for vacatur of the Award.[3] *See, e.g.*, P's Mem. at 13 (citing to the New York State CPLR § 7511 as providing the grounds for vacatur of the award). On May 10, 2023 Amazon filed its opposition to the Petition and filed a cross-petition to confirm the Award pursuant to 9 U.S.C. § 9. Dkt. No. 26 (notice of motion); Dkt. No. 27. On May 19, 2023, Lanteng filed its reply brief, Dkt. No. 29 (the "Reply"), and on June 5, 2023, Amazon filed a sur-reply, Dkt. No. 32.

## II.     DISCUSSION

### A.     Jurisdiction

The Court has jurisdiction to resolve this dispute. "The FAA does not 'independently confer subject matter jurisdiction on the federal courts.'" *Scandinavian Reinsurance Co. v. Saint Paul Fire & Marine Ins.*, 668 F.3d 60, 71 (2d Cir. 2012) (quoting *Durant, Nichols, Houston, Hodgson & Cortese-Costa, P.C. v. Dupont*, 565 F.3d 56, 63 (2d Cir. 2009)). Therefore, "'[t]here must be an independent basis of jurisdiction before a district court may entertain petitions' to confirm or vacate an [arbitration] award." *Id.* (quoting *Durant et al.*, 565 F.3d at 63).

Shortly after Amazon removed this action, Lanteng filed a pre-motion conference request letter seeking leave to move to remand the action to state court. *See* Dkt. No. 10. In its pre-motion

---

[3] The Court does not know why Lanteng did not revise its brief to address the federal legal standard notwithstanding the Court's extension of an opportunity for it to do so. Lanteng has not provided an argument that the Court should evaluate this application under the state CPLR, rather than governing federal legal standards.

letter, Lanteng argued that the Second Circuit's decision in *Scandinavian*, 668 F.3d 60, —which

recognized federal subject matter jurisdiction over actions that are governed by the Convention on

the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330

U.N.T.S. 38 (the "Convention")—does not apply because the arbitration here was "entirely

domestic." *See id.* After an in-depth discussion of its position during the pre-motion conference,

Lanteng ultimately reasonably chose not to move to remand. Still, the Court has an independent

duty to ensure it has jurisdiction. Fed. R. Civ. P. 12(h)(3).

As explained below, the Court has two bases for subject matter jurisdiction here. The Court

has jurisdiction under 9 U.S.C. § 203 because this action falls under the Convention. The Court also

has diversity jurisdiction under 28 U.S.C. § 1332(a)(2) because this action involves citizens of a State

(Amazon) and citizens or subjects of a foreign state (Lanteng) and the amount in controversy

exceeds $75,000.

### 1.    9 U.S.C. § 203

The Court has subject matter jurisdiction over this case under 9 U.S.C. § 203. That statute

provides the following:

> An action or proceeding falling under the Convention shall be deemed to arise under
> the laws and treaties of the United States. The district courts of the United States . . .
> shall have original jurisdiction over such an action or proceeding, regardless of the
> amount in controversy.

9 U.S.C. § 203; *see also Scandinavian*, 668 F.3d at 71 (noting that 9 U.S.C. § 203 "provides federal

jurisdiction over actions to confirm or vacate an arbitral award that is governed by the

Convention").

The Convention applies to "the recognition and enforcement of arbitral awards made in the

territory of a State other than the State where the recognition and enforcement of such awards are

sought," as well as to "awards *not considered as domestic awards* in the State where their recognition and

enforcement are sought." *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 18 (2d Cir.

9

1997) (quoting Convention art. I(1)).  "The Convention does not define nondomestic awards."  *Id.*

However, as relevant here, the Second Circuit defines nondomestic awards to include an award

made in the United States and decided under the laws of the United States but which "involves . . .

entities that are not U.S. citizens."  *CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 73

(2d Cir. 2017); *see also Yusuf*, 126 F.3d at 19 ("[A]wards 'not considered as domestic' denotes awards

which are subject to the Convention not because made abroad, but because made within the legal

framework of another country, e.g., pronounced in accordance with foreign law or involving parties

domiciled or having their principal place of business outside the enforcing jurisdiction." (quoting

*Bergesen v. Joseph Muller Corp.*, 710 F.2d 928, 932 (2d Cir. 1983))).

Lanteng is a Chinese company with its principal place of business in China.  Therefore, the

Convention governs this case.  *See Scandinavian*, 668 F.3d at 71 ("The New York Convention applies

in this case because Scandinavian is a foreign corporation." (citing 9 U.S.C. § 202)).[4]

## 2.   28 U.S.C. § 1332(a)(2)

The Court also has diversity jurisdiction over this action under 28 U.S.C. § 1332(a)(2).  That

statute provides the following in pertinent part:

> The district courts shall have original jurisdiction of all civil actions where the matter
> in controversy exceeds the sum or value of $75,000, exclusive of interest and costs,
> and is between-- . . . (2) citizens of a State and citizens or subjects of a foreign state
> . . . .

---

[4] In its pre-motion letter requesting leave to remand this action to state court and in the pre-motion conference
scheduled to discuss that motion, Lanteng presented a number of arguments to support its contention that this matter is
not governed by the Convention.  Lanteng first argued that the Court should not follow *Scandinavian* notwithstanding the
fact that it is governing law in this Circuit, because "some circuit courts have voiced disagreements with *Scandinavian*
rulings." Dkt. No. 10 at 1.  Even were this true, it would be irrelevant.  Second Circuit precedent is binding on this
Court.  In any event, Lanteng failed to cite to any federal courts of appeals that disagree with Scandinavian.  The only
federal appellate case Lanteng directly cited in support of its position—*United States v. Johnson*, 256 F.3d 895 (9th Cir.
2001)—was a criminal appeal involving a motion to suppress and says nothing about *Scandinavian* or the Convention.  *See*
id. Lanteng also argued that *Scandinavian* does not apply because the arbitrators in that case were certified by a foreign
institution, whereas the arbitration in this action was conducted by an American arbitrator through the American
Arbitration Association applying Washington State law. Dkt. No. 10 at 1–2.  As detailed above, the fact that the
arbitration was conducted in the United States and applied United States law does not make the arbitration domestic if it
involves entities that are not United States citizens.  *See CBF*, 850 F.3d at 73.  Lanteng reasonably elected not to pursue
these meritless arguments.

**SPA 10**

28 U.S.C. § 1332(a)(2). "Section 1332 requires 'complete diversity,' meaning that 'all plaintiffs must be citizens of states diverse from those of all defendants.'" *Tagger v. Strauss Grp. Ltd.*, 951 F.3d 124, 126 (2d Cir. 2020) (quoting *Pa. Pub. Sch. Emps.' Retirement Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 118 (2d Cir. 2014)). Here, Amazon is a citizen of a state—Washington—and Lanteng is a citizen of a foreign state—China. As a result, there is complete diversity. The amount in controversy exceeds $75,000. Therefore, diversity jurisdiction permits the Court to hear this case as well.

### B.   Legal Standard for the Confirmation of an Arbitral Award

Under the Convention, a district court "shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." *Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85, 90 (2d Cir. 2005) (quoting 9 U.S.C. § 207). "The party opposing enforcement of an arbitral award has the burden to prove that one of the seven defenses under the New York Convention applies." *Olin Holdings Ltd. v. Libya*, 73 F.4th 92, 108 (2d Cir. 2023) (quoting *Encyclopaedia Universalis*, 403 F.3d at 90). "The burden is a heavy one, as 'the showing required to avoid summary confirmation is high.'" *Id.* (quoting *Encyclopaedia Universalis*, 403 F.3d at 90).

Where an arbitration award is rendered in the United States, "the domestic provisions of the FAA also apply." *Scandinavian*, 668 F.3d at 71; *see also Zurich Am. Ins. v. Team Tankers A.S.*, 811 F.3d 584, 588 (2d Cir. 2016) ("The award in this case having been rendered in the United States, available grounds for vacatur include all the express grounds for vacating an award under the FAA." (citing *Yusuf*, 126 F.3d at 23)). "Under the FAA, courts may vacate an arbitrator's decision 'only in very unusual circumstances.'" *Oxford Health Plans LLC v. Sutter,* 569 U.S. 564, 569 (2013) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995)). Section 10(a) of the FAA sets forth grounds for vacating an arbitration award. *Jock v. Sterling Jewelers Inc.*, 646 F.3d 113, 121 (2d Cir. 2011). Under § 10(a), an award may be vacated:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

In addition to the grounds for vacatur specified in § 10(a), the Second Circuit has recognized an additional, "judicially-created ground, namely that 'an arbitral decision may be vacated when an arbitrator has exhibited a manifest disregard of law.'" *Jock*, 646 F.3d at 121 (quoting *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 208 (2d Cir. 2002)).  "To vacate an award on the basis of a manifest disregard of the law, the court must find 'something beyond and different from mere error in the law or failure on the part of the arbitrators to understand or apply the law.'" *Id.* at 121 n.1 (quoting *Westerbeke*, 304 F.3d at 208).  "The two part showing requires the court to consider, first, 'whether the governing law alleged to have been ignored by the arbitrators was well defined, explicit, and clearly applicable,' and, second, whether the arbitrator knew about 'the existence of a clearly governing legal principle but decided to ignore it or pay no attention to it.'" *Id.* (quoting *Westerbeke*, 304 F.3d at 209).

    **C.**    **Analysis**

The Award must be confirmed.  Lanteng challenges the Award by arguing that the Arbitrator acted in manifest disregard of the law and that he exceeded his authority.  In its reply, Lanteng added an argument that the Award should be vacated because the BSA violates the public policy of the State of Washington.  Lanteng has not met its burden to show that vacatur is appropriate on any of these grounds, for the reasons the Court takes up below.

12

### 1.    The Arbitrator Did Not Manifestly Disregard the Law

Lanteng has not shown that the Arbitrator acted in manifest disregard of the law.  A party seeking to vacate an arbitration award on this basis must show "something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law." *Westerbeke*, 304 F.3d at 208 (quoting *Saxis S.S. Co. v. Multifacs Int'l Traders, Inc.*, 375 F.2d 577, 582 (2d Cir. 1967)).  "An arbitral award may be vacated for manifest disregard of the law 'only if a reviewing court . . . finds both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case.'"  *Wallace v. Buttar*, 378 F.3d 182, 189 (2d Cir. 2004) (quoting *Banco de Seguros del Estado v. Mut. Marine Off., Inc.*, 344 F.3d 255, 263 (2d Cir. 2003)) (other internal quotation marks omitted).  "A federal court may not conduct a reassessment of the evidentiary record . . . ." *Id.* at 193.  Even if a court disagrees with the arbitrator's decision on the merits, "if there is a *barely colorable justification* for the outcome," then the award should be enforced.  *Id.* at 190 (quoting *Banco de Seguros*, 344 F.3d at 260).  In short, "the doctrine 'gives extreme deference to arbitrators.'"  *Id.* at 189 (quoting *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 821 (2d Cir. 1997)).

The Arbitrator did not ignore the governing law.  As described above, Lanteng's argument that the BSA was unenforceable was thoroughly briefed to the Arbitrator.  The Arbitrator responded to each argument in his Award.  In doing so, he pointed to precedential opinions issued by the Supreme Court of Washington State.  The Arbitrator did not agree with the position advocated by Lanteng, but it cannot reasonably be claimed that he ignored governing law.

In support of its request to vacate the Award based on its assertion that the Arbitrator acted in manifest disregard of the law, Lanteng reiterates the arguments that it pursued before the Arbitrator:  Lanteng argues that Section 2 of the BSA is unenforceable under Washington state law because it is procedurally unconscionable, substantively unconscionable, and constitutes an

unenforceable penalty clause.  P's Mem. ¶¶ 34–48.  As described above, the Arbitrator addressed

each of these arguments in turn.  *See* Dkt. No. 28-13 at 1–2.  In its briefing to the Court, Lanteng

cites to arbitration awards that have reached a different conclusion than the Arbitrator regarding the

enforceability of Section 2 of the BSA.  *See* Dkt. No. 18, Exs. A-2, A-3, A-4, A-8, A-9, P-15, P-16.

However, the fact that other arbitrators ruled differently does not justify vacatur of the Award.

Even if this Court disagreed with the Arbitrator's analysis, that would not provide a basis to vacate

the Award.  *See Wallace*, 378 F.3d at 190 (explaining that "[a] federal court cannot vacate an arbitral

award merely because it is convinced that the arbitration panel made the wrong call on the law").

The Court does not sit as a court of appeal with respect to the Arbitrator's legal conclusions.  "[T]he

doctrine 'gives extreme deference to arbitrators.'"  *Id.* at 189 (quoting *DiRussa*, 121 F.3d at 821).

Lanteng has not shown that the arbitrator was aware of but ignored a clearly applicable governing

legal principle.

### 2.  The Arbitrator Did Not Exceed His Authority

Lanteng's argument that the Arbitrator exceeded his authority has no merit.  The Second

Circuit has "'consistently accorded the narrowest of readings' to section 10(a)(4) permitting vacatur

where the arbitrator has exceeded her powers."  *Jock*, 646 F.3d at 122 (quoting *ReliaStar Life Ins. Co.*

*of N.Y. v. EMC Nat'l Life Co.*, 564 F.3d 81, 85 (2d Cir. 2009)).  "This is 'especially' true when section

10(a)(4) is invoked to challenge an award deciding 'a question which all concede to have been

properly submitted in the first instance.'"  *Id.* (quoting *DiRussa*, 121 F.3d at 824).

The focus of the inquiry in challenges to an arbitration award under Section 10(a)(4) is

"whether the arbitrator[] had the power, based on the parties' submissions or the arbitration

agreement, to reach a certain issue, *not whether the arbitrators correctly decided that issue*."  *Id.* (quoting

*DiRussa*, 121 F.3d at 824).  The Court will "uphold an award so long as the arbitrator 'offers a barely

colorable justification for the outcome reached.'"  *Id.* (quoting *ReliaStar*, 564 F.3d at 86).  "In other

**SPA 14**

words, 'as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' a court's conviction that the arbitrator has 'committed serious error' in resolving the disputed issue 'does not suffice to overturn his decision.'" *ReliaStar*, 564 F.3d at 86 (quoting *United Paperworkers Int'l Union, AFL-CIO v. MISCO, Inc.*, 484 U.S. 29, 38 (1987).  An arbitrator "may exceed her authority by, first, considering issues beyond those the parties have submitted for her consideration, or, second, reaching issues clearly prohibited by law or by the terms of the parties' agreement." *Jock*, 646 F.3d at 122.

There is no dispute that the Arbitrator had the power under the arbitration agreement to reach the issues decided in the Award.  The BSA's arbitration provision was broad in scope.  It unambiguously vested the Arbitrator with broad authority to resolve any dispute "relating in any way" to the BSA.  BSA ¶ 18 ("**Amazon and you both consent that any dispute with Amazon or its Affiliates or claim relating in any way to this Agreement or your use of the Services will be resolved by binding arbitration** . . . .")  The arbitration clause provided the Arbitrator the power to decide "any subsequent construction of the contract and of the parties' rights and obligations under it."  *See McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co.*, 858 F.2d 825, 832 (2d Cir. 1988).

Nor can there be any dispute that the issues resolved in the Award were submitted to the Arbitrator for decision.  Lanteng initiated the arbitration for the express purpose of obtaining a ruling regarding what it described as Amazon's "wholly unjustified indefinite withholding of sales proceeds . . . ."  *See* Lanteng's Arbitration Demand, Dkt. No. 28-6, ¶ 23.  And, as described above, the parties fully briefed issues related to Amazon's authority to seize the funds under the BSA and the enforceability of the BSA.  In sum, the arbitrator was acting within his authority when he issued the Award.

15

The Arbitrator also had a colorable justification under Washington law to rule as he did.  He reviewed the factual record presented to him by the parties.  He evaluated the text of the BSA and relevant precedent.  He had more than a colorable basis to conclude that the text of the BSA permitted Amazon to withhold funds from Lanteng.  As described above, Lanteng does not contest that the language of the agreement permits Amazon to withhold funds as a remedy, but, rather, that this provision of the BSA is unenforceable.  The Arbitrator evaluated binding precedent by the Supreme Court of the State of Washington to reach the conclusion that the BSA was enforceable.  Therefore, the Arbitrator had more than a colorable justification to issue the Award.

Lanteng's arguments boil down to a contention that the Arbitrator did not "[get] it right"— but such an error, even if one existed, would not justify vacatur of the award.  *See Jock*, 646 F.3d at 124.  Lanteng argues that the Arbitrator exceeded his authority by allowing Amazon to retain the funds in Lanteng's seller account without "presenting any evidence regarding its damages" or "fil[ing] any counterclaim for damages."  P's Mem. ¶ 32.  These contentions, even if accurate, would not justify vacatur of the Award:  The Arbitrator had the authority to determine whether Amazon was required to return those funds to Lanteng—it was the issue that Lanteng requested that he resolve.[5]

It is not this Court's role to determine whether the Arbitrator made the right decision, but simply whether the decision was within the scope of his power.  The issue of Amazon's retention of Lanteng's funds under the BSA was squarely presented to the Arbitrator, and Lanteng has not shown that the parties' arbitration agreement or the law prohibited the Arbitrator from deciding that issue.  Lanteng's arguments that the Arbitrator ruled incorrectly are misplaced and do not suffice to vacate the Award.  *See Jock*, 646 F.3d at 124 ("[I]t is not for the district court to decide whether the

---

[5] Lanteng's argument also ignores the portion of the Award in which the Arbitrator determined that the provision of the BSA constituted a valid liquidated damages provision.

16

**SPA 16**

arbitrator 'got it right' when the question has been properly submitted to the arbitrator and neither the law nor the agreement categorically bar her from deciding that issue.").

### 3. Enforcement of the Award Would Not Violate Public Policy

Lanteng argues for the first time in its reply brief that the arbitration award should be vacated on the grounds that the BSA violates Washington State's public policy. *See* Reply at 15–18. Lanteng points to a bankruptcy court decision in the District of Arizona that, Lanteng contends, applied a six-factor balancing test used by Washington State courts to determine whether a contract should be declared invalid on public policy grounds. *See* Reply at 15. Lanteng argues that the bankruptcy court's analysis should be applied in this case and that the Court should rule that "*Section 2 is unenforceable as violative of Washington's public policy.*" *Id.* at 18. Lanteng contends that the Court should vacate the Award on that basis. *Id.*

Lanteng's delay in raising this argument alone warrants its rejection. *See Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993) ("Arguments may not be made for the first time in a reply brief."); *Fisher v. Kanas*, 487 F. Supp. 2d 270, 278 (E.D.N.Y. 2007), *aff'd,* 288 F. App'x 721 (2d Cir. 2008).  In any event, Lanteng's argument does not justify vacatur of the Award.

Moreover, this is not a question for the Court to address in the first instance.  If Lanteng failed to raise this issue with the Arbitrator, "the issue is forfeited." *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 315 (2d Cir. 1998).  Again, the Court does not sit as a super-court of

17

59

appeals with respect to the Arbitrator's Award.  As described above, the Arbitrator did not act in manifest disregard of the law.[6]

### 4.    Amazon's Cross-Petition to Confirm Is Granted

Amazon cross-petitions the Court to confirm the Award pursuant to 9 U.S.C. § 9.  Dkt. No. 26 at 1.  "When a party seeks confirmation of an arbitral award under the New York Convention, '[t]he court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.'"  *Olin Holdings*, 73 F.4th at 108 (alteration in original) (quoting 9 U.S.C. § 207).  "An arbitration award should be confirmed 'unless the award is vacated, modified, or corrected.'"  *Bogar v. Ameriprise Fin. Servs., Inc.*, No. 1:16-CV-7199-GHW, 2017 WL 1745566, at *4 (S.D.N.Y. May 4, 2017) (quoting *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006).  "Due to the parallel natures of a motion to vacate and a motion to confirm an arbitration award, denying the former implies granting the latter."  *L'Objet, LLC v. Limited*, No. 11 CIV. 3856 LBS, 2011 WL 4528297, at *3 (S.D.N.Y. Sept. 29, 2011).  Accordingly, because Lanteng has not shown that any of the grounds for refusal or deferral of enforcement of the Award apply, Amazon's motion to confirm the Award is granted.

---

[6] Lanteng did not argue that the Award should be vacated pursuant to the public policy exception incorporated in the Convention.  "[T]his public policy exception is to be construed very narrowly and should be applied only where enforcement would violate our most basic notions of morality and justice."  *See Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 315 (2d Cir. 1998) (citations and internal quotation marks omitted).  *Id.* (citations and internal quotation marks omitted).  "The party opposing enforcement of the arbitration award has to announce some explicit public policy of the country or state where the award is to be enforced that is well defined and dominant, and . . . ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests."  *See PB Life & Annuity Co. v. Universal Life Ins. Co.*, No. 20-CV-2284 (LJL), 2020 WL 4369443, at *10 (S.D.N.Y. July 30, 2020) (cleaned up) (citations omitted).  Important here, this exception asks whether enforcement of the award would violate public policy, not whether the underlying contract violates public policy.  *See PB Life*, 2020 WL 4369443, at *10 ("This Court must determine whether the award itself, as contrasted with the reasoning that underlies the award, creates an explicit conflict with other laws and legal precedents and thus clearly violates an identifiable public policy." (cleaned up) (quoting *Int'l Bhd. of Elec. Workers, Loc. 97 v. Niagara Mohawk Power Corp.*, 143 F.3d 704, 716 (2d Cir. 1998)); *see also Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 315 (2d Cir. 1998) (distinguishing award from underlying contract).  Lanteng's motion does not begin to meet this high standard.  Lanteng's argument is that the BSA—the contract—is unenforceable under Washington State law, not that enforcement of the award would violate public policy.  Lanteng fails to identify any explicit public policy that would be violated or to show that enforcement of the Award "would violate our most basic notions of morality and justice."  *Europcar*, 156 F.3d at 315 (citation and internal quotation marks omitted); *see also PB Life*, 2020 WL 4369443, at *10 (explaining that "general considerations of supposed public interests" does not suffice (citation omitted)).

18

**SPA 18**

**III.      CONCLUSION**

For the reasons stated above, Lanteng's petition to vacate the Award is DENIED, and Amazon's cross-petition to confirm the Award is GRANTED.  The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 19 and 26, to enter judgment in favor of Amazon, and to close the case.

SO ORDERED.

Dated:  September 26, 2023
         New York, New York

_____
GREGORY H. WOODS
United States District Judge

**SPA 19**

JA-663

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------X
SHENZHEN LANTENG CYBER
TECHNOLOGY CO., LTD.,

                Petitioner,                      23 **CIVIL** 991 (GHW)

        -against-                           **JUDGMENT**

AMAZON.COM SERVICES, LLC and
AMAZON.COM, INC.,

                Respondents.
--------------------------------------------------------------X

        It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Memorandum Opinion and Order dated September 26, 2023, Lanteng's

petition to vacate the Award is DENIED, and Amazon's cross-petition to confirm the Award is

GRANTED. Judgment is entered in favor of Amazon; accordingly, the case is closed.

**Dated**: New York, New York
      September 26, 2023

                               **RUBY J. KRAJICK**
                         _____
                               **Clerk of Court**

        **BY:**             *K. Mango*
                             _____
                              **Deputy Clerk**

**SPA 20**